UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALFONZO CHURCHWELL,
    Petitioner,

v.                       Case Nos.  8:25-cv-373-WFJ-TGW
                                                 8:18-cr-205-WFJ-TGW

UNITED STATES OF AMERICA,
    Respondent.

## UNITED STATES' RESPONSE IN OPPOSITION TO CHURCHWELL'S 28 U.S.C. § 2255 MOTION TO VACATE

The United States opposes for the following reasons Alfonzo Churchwell's amended motion to vacate, set aside, or correct his sentence. Civ. Doc. 4.[1]

## I.    STATEMENT OF THE CASE AND FACTS

### A.    Procedural history

In 2019, the United States, in a 20-count superseding indictment, charged Alfonzo Churchwell, Jordan Rodriguez, Andrew Thompson, Juan Ortiz, Raymy Escoto, and Phillip Uscanga with crimes relating to their participation in a violent drug-trafficking racketeering enterprise as follows:

---

[1] References to filings in the criminal case are cited as "Crim. Doc. [document number]." References to filings in this civil case are cited as "Civ. Doc. [document number]." References to filings in the appellate case (20-10373) are cited as "App. Doc. [document number]." Pinpoint citations to electronically filed documents refer to the docket number followed by the page number that appears in the header generated by the court's electronic filing system.

| Count | Persons Charged | Offenses |
|---|---|---|
| 1 | Churchwell, Rodriguez, Thompson, and others | Conspiracy to conduct and to participate in the affairs of a racketeering enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). |
| 2 | Churchwell, Rodriguez, and Thompson | Conspiracy to distribute and to possess with intent to distribute various controlled substances, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). |
| 3 | Rodriguez and others | Conspiracy to murder rival gang members in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5). |
| 4 | Rodriguez and others | Murder in aid of racketeering (victim Julio Tellez), in violation of 18 U.S.C. § 1959(a)(1) and (2). |
| 5 | Rodriguez and others | Use and discharge of a firearm during and in relation to the offense charged in count four, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(j)(1), and 2. |
| 8 | Thompson | Possession of various controlled substances on May 11, 2016, with intent to distribute them, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). |
| 9 | Churchwell | Murder in aid of racketeering (victim Earnestine Gardner), in violation of 18 U.S.C. § 1959(a)(1). |
| 10 | Churchwell | Use and discharge of a firearm during and in relation to the offenses charged in counts two, nine, and twenty, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and (j)(1). |
| 11 | Churchwell | Possession of ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). |
| 12 | Rodriguez | Accessory after the fact to the offenses charged in counts nine, ten, and eleven, in violation of 18 U.S.C. § 3. |
| 13 | Thompson | Attempt to possess Schedule I and II controlled substances on January 13, 2017, with intent to distribute them, in violation of 21 U.S.C. §§ 841(b)(1)(C) and 846. |
| 14 | Thompson | Murder in aid of racketeering (victim Lashawn Stevenson-Weeks), in violation of 18 U.S.C. § 1959(a)(1). |
| 15 | Thompson | Use and discharge of a firearm during and in relation to the offenses charged in counts two, thirteen, and fourteen, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and (j)(1). |
| 16 | Thompson | Murder in aid of racketeering (victim Berry Joseph), in violation of 18 U.S.C. § 1959(a)(1). |
| 17 | Thompson | Use and discharge of a firearm during and in relation to the offenses charged in counts two, thirteen, and sixteen, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and (j)(1). |
| 18 | Thompson | Possession of a firearm while subject to a domestic-violence restraining order, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). |
| 19 | Rodriguez | Accessory after the fact to the offenses charged in counts fourteen through eighteen, in violation of 18 U.S.C. § 3. |
| 20 | Churchwell, Rodriguez, and Thompson | Aiding and abetting each other in the maintenance of a place for the purpose of manufacturing and distributing controlled substances, in violation of 21 U.S.C. § 856(a)(1) and (b) and 18 U.S.C. § 2. |

Crim. Doc. 255.[2]

---

[2] Jesse Rodriguez was charged in the original indictment but entered into a plea agreement with the United States and pleaded guilty in 2018 before the superseding indictment. Crim. Doc. 250.

Oritz, Ecsoto, and Uscanga ultimately entered guilty pleas with plea agreements, Crim. Docs. 290, 306, 310, 341, and Churchwell, Rodriguez, and Thompson proceeded to trial, where Churchwell was acquitted of murder in aid of racketeering (count nine) but was otherwise convicted as charged. Crim. Doc. 406.[3] He appealed, Crim. Doc. 464, challenging the denial of his motion for judgment of acquittal and the district court's instruction on the count of maintaining a drug premises. The United States Court of Appeals for the Eleventh Circuit affirmed. *See United States v. Thompson*, No. 20-10373, 2023 WL 8015755 (11th Cir. Nov. 20, 2023).

Churchwell did not file a motion for rehearing.[4] He filed a construed § 2255 motion on or about December 9, 2024. Civ. Doc. 1 at 12. He filed his construed amended § 2255 motion on March 12, 2025. Civ. Doc. 4.

## B.    Statement of Facts

**The Third Shift Gang**

Members of the "Third Shift" gang congregated in the Bradenton, Florida, suburb of Oneco. Crim. Docs. 534 at 29, 34, 143, 237–38; 535 at 13–14, 22, 140; 537 at 13. Gang members, including Rodriguez (a/k/a "Big Man"), his brother Jesse

---

[3] The jury convicted Rodriguez and Thompson as charged except that it acquitted Thompson of the Robinson and Randall murders as racketeering-conspiracy predicate acts. Crim. Docs. 405–406.

[4] Churchwell moved pro se to extend his deadline for filing a petition for rehearing, App. Doc. 156, but the Eleventh Circuit took no action because Churchwell's motion was deficient, App. Doc. 157.

Rodriguez, his best friend Thompson (a/k/a "Nico"), Johnny Cintron, Juan Ortiz, Churchwell (a/k/a "Boo Boo"), Phillip Uscanga, Raymy Escoto, Quentin Couch, and others, committed crimes together and used and sold drugs together in that area.[5] Crim. Doc. 534 at 146–53, 226, 229–30, 233, 242; *see* Crim. Doc. 535 at 13–14.

The Third Shift members often assembled at a house on 11th Street in Oneco, which local drug distributor Eugene Washington had set up as a trap house, placing Rodriguez in charge. Crim. Docs. 537 at 18–19, 39–40, 68, 136; 539 at 95. Rodriguez and others sold drugs—including marijuana, cocaine, crack cocaine, and heroin—at the house every day. Crim. Docs. 534 at 152–53, 156–59, 162–68, 240; 535 at 117–22, 130; 536 at 182–83; 537 at 20–21, 135–37; *see* Crim. Docs. 535 at 32–33; 538 at 96, 145. Washington also cooked crack cocaine there. Crim. Doc. 534 at 173–74. When customers came to the house, whoever happened to be there at the time would answer the door, and Rodriguez would sell the drugs either in the kitchen or the living room. Crim. Doc. 534 at 158. Rodriguez sometimes allowed prostitution at the 11th Street house too. Crim. Docs. 534 at 161; 537 at 21–22, 137–38.

To protect the group, Rodriguez had cameras set up around the house and kept guns there, including an AK-47, a shotgun, a revolver, and a 9-millimeter handgun. Crim. Docs. 534 at 169–70; 535 at 122–23; 537 at 21; *see* Crim. Docs. 536 at 184; 538 at 143–45. All the Third Shift members were allowed to handle those

---

[5]In this response, we refer to Jordan Rodriguez as "Rodriguez," and we refer to his brother Jesse Rodriguez by his full name. Ortiz is their cousin. Crim. Doc. 535 at 118. Thompson is the uncle of Cintron's child. Crim. Doc. 534 at 149, 225.

guns. Crim. Docs. 534 at 171–72; 535 at 123; 537 at 21. Churchwell particularly liked the AK-47. Crim. Doc. 534 at 242.

In June 2016, the Manatee County Sheriff's Office installed a pole camera focused on the 11th Street house. Crim. Doc. 536 at 83–84. Footage from the camera showed Rodriguez holding a gun, with foot and vehicle traffic at the house throughout the day and night. Crim. Docs. 536 at 128–42; 538 at 135–36. Footage also showed Rodriguez apparently engaging in drug-trafficking activity in a van at the house. Crim. Doc. 538 at 195–96, 200–03, 208. And during a traffic stop of the van, officers found Rodriguez with more than $3700, three guns, ammunition, marijuana, pills, crack cocaine, and white powder. Crim. Docs. 538 at 196–98, 213–14, 225–27; 539 at 12–13, 16–19.

The pole camera also captured footage of Thompson at the 11th Street house, at times carrying a rifle. Crim. Doc. 538 at 140–41. He always had a gun with him, sometimes an AK-47 rifle, sometimes a 9-millimeter, and sometimes another type. Crim. Docs. 536 at 20–23; 540 at 33, 172. Thompson was well known to Manatee County law-enforcement officers, who dealt with him on a regular basis. Crim. Doc. 535 at 229–30. He sold marijuana, methamphetamine, crack cocaine, and powder cocaine, which he obtained from Rodriguez and others. Crim. Docs. 539 at 92–93; 540 at 33, 171. Rodriguez's sister, who was Thompson's girlfriend, described Thompson as Rodriguez's "little do-boy." Crim. Doc. 539 at 96–97. On one occasion, Thompson and others were at the 11th Street house wearing black clothes and ski masks, and, when asked what they were doing, Thompson said he was

5

shooting back and forth with Mexicans down the road. Crim. Doc. 540 at 172–74.
Thompson also would shoot from a car as his girlfriend drove because he wanted to
instill fear in others. *Id*. at 175.

### Thompson's Murder of Demetrius Robinson and Florence Randall

On December 31, 2015, Jessica Sergeant planned to celebrate New Year's Eve
with her friends Demetrius Robinson and Florence Randall at their apartment, not
far from Rodriguez's 11th Street house. Crim. Doc. 539 at 57–59. As Sergeant
approached their apartment sometime after midnight, she heard celebratory
fireworks and gunshots that seemed too close for comfort. *Id*. at 60. She then saw a
man running from behind the apartment. *Id*. at 61–62. She went to the door and,
although she could smell food cooking, no one answered. *Id*. at 62. She left but
returned later with two friends and found smoke emanating from the apartment. *Id*.
at 62–63. They broke into the apartment, which was thick with smoke from food that
was cooking on the stove, and discovered Robinson lying on the floor, not moving,
and they called for an ambulance. *Id*. at 62–63.

Robinson's body was cold when law enforcement arrived. Crim. Doc. 539 at
28–31. Robinson had bullet holes in his back and shoulder, and bullet casings were
near his head and back. Crim. Doc. 539 at 29, 36, 38–39. The responding deputy
found Randall's body on a bed in a back room, slumped over. Crim. Doc. 539 at 29–
32, 36. Both she and Robinson had died from multiple gunshot wounds. Crim. Docs.
539 at 30; 540 at 61–69, 71–76. More bullet casings were near the bed and on the

6

bathroom floor, along with drug paraphernalia and a crack-cocaine cookie in the apartment. Crim. Doc. 539 at 37–43.

Thompson was not home at the time of the murders, and, when he returned home later that day, he was paranoid and upset. Crim. Doc. 539 at 98, 105. While incarcerated later, he told fellow inmate Kyle Stackhouse that he had planned to rob Robinson, but, when Robinson had resisted, he had shot him and his girlfriend and disposed of the firearm. Crim. Doc. 540 at 36–38. Investigators later found ammunition in Thompson's home of the same type that had been found at the murder scene. Crim. Docs. 539 at 42–46; 541 at 81.

### Rodriguez's Murder of Julio Tellez

Driving his red Mustang on the morning of January 1, 2016, Uscanga picked up Cintron, and the two headed to a nearby store to buy cigars. Crim. Doc. 534 at 184–85. When they arrived at the store, Cintron noticed a blue minivan in the parking lot and saw South Side gang member Bruno Barroso. *Id*. at 187. The Third Shift gang and the South Side gang were rivals, and their members often clashed. Crim. Docs. 534 at 29–34, 144, 153–54, 176–79, 182–84; 535 at 153–54, 159. On one occasion Barroso and other South Side members shot at Thompson's house, and Thompson shot at "a whole group of people," proclaiming, "Mother fuck South Side nigger!" Crim. Doc. 541 at 190. The 11th Street house was also the target of a drive-by shooting, Crim. Doc. 538 at 132–33.

Barroso was at the store with Jilberto Mateo and Ashleigh Bradford, who was driving the van. Crim. Docs. 534 at 187–88; 535 at 155. Mateo and Cintron both

entered the store, where they argued. Crim. Doc. 534 at 188. Mateo left the store first, and, when Cintron followed, Barroso and Mateo jumped on him and began hitting him with a stick. Crim. Docs. 534 at 38–44, 188–89; 535 at 156. Barroso and the others then fled in the minivan. Crim. Doc. 534 at 46–50, 59–61, 189–92. With Uscanga and Cintron pursuing them in the Mustang, the group in the minivan headed to the home of South Side member Julio Tellez. Crim. Docs. 534 at 190–91; 535 at 156–57. On the way there, the Mustang pulled up beside the van, and Uscanga and Cintron threatened to kill the group in the van. Crim. Doc. 535 at 157–58.

Tellez was home with his friends Juan Montoya and Eduardo Alvarez when Barroso and the others pulled up in the minivan and Barroso ran to them seeking a gun. Crim. Doc. 535 at 159; *see* Crim. Doc. 534 at 58–60. Tellez didn't have one, so the group in the minivan left. Crim. Doc. 535 at 159; *see* Crim. Doc. 534 at 59–60.

Meanwhile, Uscanga and Cintron decided not to stop at Tellez's house because they believed that the South Side members had guns there. Crim. Doc. 534 at 192. Instead, they picked up Escoto, who had a gun, and then went to Rodriguez's house for ammunition. *Id.* at 192–93. There, they encountered Rodriguez and Ortiz, and Cintron told them about the fight and asked Rodriguez for ammunition. *Id.* at 194. Rodriguez directed Cintron to Rodriguez's room, where Cintron retrieved ammunition. *Id.* at 193–94. Cintron wiped his fingerprints off the rounds as he loaded them into the gun, a trick he had from Rodriguez. *Id.* at 194–95.

Eager to return to Tellez's house before Barroso escaped, the group decided that Uscanga, driving the Mustang with Cintron and Escoto as passengers, would go to Tellez's house, and Cintron would fire the gun to draw people outside. Crim. Doc. 534 at 195–97. Rodriguez and Ortiz would follow in Rodriguez's blue Honda, and Rodriguez would "finish the job" by shooting anyone who had come outside. *Id.* at 196–98.

While Cintron, Uscanga, Escoto, Rodriguez, and Ortiz planned their attack, the group at Tellez's house created a perimeter around the house with cars. Crim. Doc. 534 at 60–61. Tellez also called Eliceo Santoyo and told him that trouble was brewing, so Santoyo brought Tellez two guns. *Id.* at 60, 81–82.

As planned, the group from Rodriguez's house headed to Tellez's house, with Uscanga driving the red Mustang and Cintron in the front passenger seat and Escoto in the back. Crim. Doc. 534 at 197–98. As the Mustang passed Tellez's house, Cintron began shooting. *Id.* at 198. The men inside the house heard gunshots and windows breaking as bullets flew by, but no one was hit and the group in the Mustang drove away. *Id.* at 61, 74, 83.

Falling for the Third Shift members' plan, Tellez and Santoyo ran outside to see who had attacked them and to return fire. Crim. Doc. 534 at 62, 83. Montoya was coming to join Santoyo and Tellez outside just as Rodriguez and Ortiz pulled up in Rodriguez's Honda. *Id.* at 62–63, 70, 84–87, 197. Rodriguez began firing, hitting Montoya and Tellez. *Id.* at 62–70, 87–90. Tellez died from his wounds. *Id.* at 122.

Uscanga, Cintron, Escoto, Rodriguez, and Ortiz returned to Rodriguez's house, where Rodriguez recounted how Cintron and the others had lured the men out of Tellez's house, and, with those men focused on Uscanga's Mustang, Rodriguez had had the upper hand when he had started shooting them. Crim. Doc. 534 at 201–02. Rodriguez said he had seen a "body drop" and that, as he had been shooting, he had said, "Fuck South Side." *Id.* at 202–03. Concerned about being implicated in the crime, Cintron and Uscanga later set the Mustang on fire. *Id.* at 205–06. About a week after Tellez's murder, Rodriguez posted this on his Facebook page:

> I play this game. Well, I feel like its monopoly, except I'm grinding hard. I don't see nothing stopping me. Tossin out that money like I'm some kinda slot machine. Keep ya eyes to yaself before u hear that choppa scream. 100 round drum, and its fully loaded. Take me as a joke but ima shoot it if I tote it. I got plenty money. I just don't like to show it. Got my own car and bike and best believe I own it.

Crim. Doc. 535 at 17–18.

In that area, the term "choppa" was commonly used to refer to an assault rifle. Crim. Doc. 535 at 17–18. A friend later told Rodriguez that someone had snitched on him and Rodriguez replied that he was tired of "niggas who act gangster but they want to talk to police when gangster shit goes down," and then said he needed to get out of state before he caught "a charge for fukin somebody up." *Id.* at 18–19.

**Churchwell's Murder of Earnestine Gardner**

On the night of September 10, 2016, Couch, Cintron, Churchwell, and Jordan and Jesse Rodriguez were all at the 11th Street house, and Churchwell had

Rodriguez's .357 revolver. Crim. Docs. 535 at 127–28; 537 at 25. At the time, the house contained another gun, holsters, ammunition, gun magazines, stacks of cash, and drug paraphernalia, among other things. Crim. Docs. 536 at 91–115, 125–26; 537 at 75–76, 81.

Tina Caldwell and Earnestine Gardner arrived there early the next morning, planning to buy drugs. Crim. Doc. 536 at 45–48, 55, 142. While Caldwell waited in the car, Gardner got out and soon became embroiled in a heated conversation with Churchwell, claiming that Churchwell had shorted her in change for her drug purchase from him. Crim. Docs. 536 at 48–49, 143, 185, 188–89; 537 at 27–38. As they argued, Stephanie Brewer, a/k/a "Jamaica," arrived at the house. Crim. Doc. 537 at 25–27. Fearing that the argument might draw law-enforcement attention, Brewer had someone awaken Rodriguez, who was asleep in a bedroom, so he would settle the argument. *Id*. Rodriguez went outside where the two were arguing. *Id*. at 27, 30. A short time later, Churchwell entered the house, and, as he was telling Brewer about the argument, Gardner entered the house, heatedly spoke to Churchwell, and then turned and went back outside. *Id*. at 28–32. Churchwell immediately followed, pulled out a gun, and shot Gardner from behind. *Id*. at 31–32, 44, 57–58, 62. He then walked up to her and shot her three more times. *Id*. at 32–33, 57. He and others, including Couch, Jesse Rodriguez, and Cintron, fled from the house. Crim. Docs. 535 at 129, 139–40; 536 at 144, 147, 173–74, 191.

Rodriguez called 911, and, although he had been standing next to Churchwell when Churchwell shot Gardner, he claimed to have heard gunshots outside his

11

house and found a woman lying in the yard but had not seen the shooter. Crim. Doc. 536 at 3, 147–48, 204–05. He later told law-enforcement officers that he didn't even know Churchwell. Crim. Doc. 537 at 97–98. But Churchwell's cellphone records showed that his phone had been used to call Rodriguez's phone three times in quick succession minutes after Gardner's murder. Crim. Doc. 538 at 125. And between 8:00 that morning and 5:00 that evening, Churchwell's phone and Rodriguez's phone had exchanged 12 calls. Crim. Doc. 538 at 126.

Churchwell was arrested for Gardner's murder in September 2016, and a few months after his arrest, he called Rodriguez from jail. Crim. Docs. 537 at 94; 538 at 149–150. Rodriguez told Churchwell that law-enforcement officers had recently returned the DVR that he used with the security cameras at his house but assured him that "all they got is Jamaica" (Stephanie Brewer). Crim. Doc. 538 at 174–75. Churchwell pledged to Rodriguez that he would spill his blood for him and then asked Rodriguez if he could determine who had been at the house on the morning of the murder so those people could "verify" that he had not been there. Churchwell called Rodriguez and Thompson from jail in December 2016. Crim. Doc. 540 at 19, 23. Probably referring to the .357 revolver that he had been handling the night before Gardner's murder, Churchwell called Rodriguez again a month later and asked him to be sure that he got rid of the "three-wheeler." Crim. Docs. 535 at 127–28; 537 at 25.

**Thompson's Murder of Barry Joseph and Lashawna Stevenson-Weeks**

Barry Joseph was a drug dealer, and Thompson was one of his customers. Crim. Docs. 539 at 133–35; 540 at 171, 175–76. On the morning of January 13, 2017, Thompson, who was armed, told his girlfriend Shazlynn Dunton that he was going to see Joseph to pay him money that he owed. Crim. Doc. 540 at 177. He left in Dunton's gray Pontiac G6, taking with him a cellphone that he and Dunton shared. *Id.* at 178, 182. He met Joseph in a parking lot and then followed him back to Joseph's house, where he parked next to Joseph's Ford Explorer at about 12:49 p.m. *Id.* at 38, 89–96.

Brittany Rayburn and Zachary Davis lived across the street, and Rayburn noticed the two vehicles parked in the driveway of Joseph's house. Crim. Doc. 539 at 143–46, 162. She saw a person in the passenger seat of the Explorer and two people standing next to it on the driver's side, one of whom was African American and wearing a red hat. *Id.* at 146–47, 154–55. From her front porch, Rayburn heard a gunshot and saw that one person who had previously been standing was then on the ground, while the person wearing the red hat was leaning into the Explorer's passenger side. Crim. Doc. 539 at 148. Rayburn looked away but then heard more gunshots. *Id.* at 148, 158. Hearing the shots, Davis came outside too, and both he and Rayburn saw the man in the red hat get into the Pontiac and drive away. Crim. Doc. 539 at 148–49, 163–64, 168. They called 911 at 1:18 p.m. *Id.* at 149; Crim. Doc. 540 at 96.

Shortly after the murders, Thompson's phone and Rodriguez's phone exchanged numerous calls. Crim. Doc. 541 at 21–23. Later that day, Thompson returned home with Rodriguez driving him. Crim. Doc. 540 at 177–79. Dunton asked Thompson where her car was, and he claimed that the car was being fixed because a tree branch had fallen on the windshield while he had been at his grandmother's birthday party. *Id.* at 182. Yet he put the clothes he had been wearing that day on the couple's grill and lit them on fire, and he no longer had a gun with him. *Id.* at 179. In truth, the shooting had resulted in damage to Dunton's Pontiac, including a bullet hole in its windshield and damage to the driver-side window. *Id.* at 97, 183. Rodriguez had apparently assisted with the repairs because he later told Thompson and Dunton that the car was repaired and ready to be picked up. *Id.* at 183.

## II.    MEMORANDUM OF LAW

### A.    Burden of proof

In general, on collateral review the petitioner bears the burden of proof and persuasion on each and every aspect of his claim, *Beeman v. United States*, 871 F.3d 1215, 1221–25 (11th Cir. 2017) (collecting cases), which is "a significantly higher hurdle than would exist on direct appeal" under plain error review, *see United States v. Frady*, 456 U.S. 152, 164–66 (1982). Accordingly, if this Court "cannot tell one way or the other" whether the claim is valid, then the petitioner has failed to carry his burden. *In re Moore*, 830 F.3d 1268, 1273 (11th Cir. 2016); *see also Williams v. United*

14

*States*, 985 F.3d 813, 821 (11th Cir. 2021) ("When a case turns on an issue of historical fact, the available evidence, whether traffic footage or the legal landscape of yesteryear, must satisfy the burden of proof on the disputed issue. If the evidence is silent or in equipoise, then the party with the burden fails."). Churchwell cannot meet this burden.

### B.    Timeliness

Churchwell's judgment of conviction became final on February 18, 2024, when the time for seeking certiorari review had expired. *See Kaufmann v. United States*, 282 F.3d 1336, 1338 (11th Cir. 2002) (if prisoner does not petition for certiorari, conviction becomes final upon expiration of ninety-day period for seeking certiorari). Therefore, he had until February 18, 2025, to file his § 2255 motion. Churchwell filed his initial § 2255 motion on or about December 9, 2024, which is the date it was first stamped by the clerk for the Middle District of Florida. *See* Civ. Doc. 1 at 1. Churchwell did not date his motion and there is no indication of a mailing date on the envelope. *See* Civ. Doc. 1 at 15, 18. The Clerk's electronic heading, however, indicates a filing date of February 13, 2025, *see* Civ. Doc. 1, though it is unclear why.

On February 25, 2025, this Court entered an order striking the motion without prejudice for failure to submit it in the proper form and for lacking sufficient information to conduct a preliminary review. Civ. Doc. 2. The order gave Churchwell until March 20, 2025, to file an amended § 2255 motion. *Id.*  Churchwell filed a second-in-time § 2255 motion, though not labeled "amended" as instructed by

this Court's order, on March 12, 2025. Civ. Doc. 4. *See Washington v. United States*, 243 F.3d 1299, 1300 (11th Cir. 2001) (pleadings filed by an incarcerated petitioner are deemed filed on the date they were placed into the prison's official mail system). And it added a twelfth ground for relief that had not been raised in the initial § 2255 motion. *See* Civ. Doc. 4 at 20 ¶ 21. That motion complied with the deadline imposed by this Court order but was outside the statutory filing deadline of February 18, 2025.

Churchwell has not addressed the timeliness of his construed amended § 2255 motion. *See* Civ. Doc. 4 at 11. The United States recognizes that the motion complied with this Court's filing deadline imposed in its February 25, 2025, order. *See* Civ. Doc. 2. That order, however, was issued after the expiration of Churchwell's one-year deadline to file a § 2255 motion and Churchwell's initial § 2255 motion was stricken as non-compliant with the form rule and for lacking sufficient information to conduct a preliminary review. *See id*.

Under these circumstances, the United States does not waive any challenge to the timeliness of the grounds raised in Churchwell's construed amended § 2255 motion.

## C.    Cognizability and procedural bars

Churchwell's claims that counsel was ineffective are grounded in the Sixth Amendment and are cognizable under § 2255. *See, e.g., Lynn v. United States*, 365 F.3d 1225, 1234 n.17 (11th Cir. 2004) (ineffective assistance claims should be decided in § 2255 proceedings). Similarly, Churchwell's ineffective assistance of counsel claims

16

are not procedurally barred. *Massaro v. United States*, 538 U.S. 500, 509 (2003); *Lynn v. United States*, 365 F.3d 1225, 1234 n.17 (11th Cir. 2004).

### D.    Merits

To succeed on an ineffective assistance of counsel claim, a petitioner must meet a stringent, two-prong test. First, the petitioner must show that counsel committed "errors so serious that counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Second, the petitioner must prove resulting prejudice. *Id.* If the petitioner fails to establish either of the *Strickland* prongs, his claim fails. *See Maharaj v. Sec'y, Dep't of Corr.*, 432 F.3d 1292, 1319 (11th Cir. 2005). *Strickland* sets a "high bar" for ineffective assistance claims, and surmounting it "is never an easy task." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal quotation marks and citation omitted).

When evaluating performance, this Court must apply a "strong presumption" that counsel has "rendered adequate assistance and [has] made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. To establish deficient performance, a petitioner must show that "no competent counsel would have taken the action that his counsel did take." *See Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc). The standard that the petitioner must meet is both "rigorous" and "highly demanding," and requires a showing of "gross incompetence" on counsel's part. *Kimmelman v. Morrison*, 477 U.S. 365, 381–82 (1986).

A petitioner demonstrates prejudice only when he establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* As discussed below, Churchwell fails to meet his burden as to all 12 of his ineffective-assistance claims.

### **Ground One**

In ground one, Churchwell claims that his trial counsel was ineffective for not moving to dismiss counts one and two on grounds of multiplicity and double jeopardy. Civ. Doc. 4 at 4.[6] But this claim fails. An indictment is multiplicitous "if it charges a single offense in more than one count." *United States v. Williams*, 527 F.3d 1235, 1241 (11th Cir. 2008). A multiplicitous indictment "violates double jeopardy principles by giving the jury more than one opportunity to convict the defendant for the same offense." *United States v. Woods*, 684 F.3d 1045, 1060 (11th Cir. 2012). A multiplicitous-indictment challenge is subject to the same standard as a double-jeopardy challenge. *Id.* Thus, "charges in an indictment are not multiplicitous if the charges differ by even a single element or alleged fact." *Id.*

Counts one of Churchwell's superseding indictment charged a violation of 18 U.S.C. § 1962(d) and count two charged a violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). Crim. Doc. 255. To find Churchwell guilty of count one, the jury had

---

[6] Counsel did unsuccessfully move to dismiss count two, but on a different double jeopardy ground. *See* Crim. Docs. 180; 229.

to find that: (1) two or more people agreed to try to accomplish an unlawful plan to engage in a pattern of racketeering activity; (2) Churchwell knowingly and willfully joined in the conspiracy; and (3) when Churchwell joined in the agreement, he had the specific intent either to personally participate in committing at least two acts of racketeering, or else to participate in the enterprise's affairs, knowing that other members of the conspiracy would commit at least two acts of racketeering and intending to help them as part of a pattern of racketeering activity. Crim. Doc. 403 at 22–23. And to find Churchwell guilty of the controlled-substance conspiracy, the jury had to find that: (1) two or more people in some way agreed to try to accomplish a shared and unlawful plan; (2) Churchwell knew the unlawful purpose of the plan and willfully joined in it; and (3) the object of the unlawful plan was to distribute or to possess with the intent to distribute a controlled substance. *Id*. at 40.

As is evident, these two counts involved separate elements and therefore survive a double jeopardy challenge. *See United States v. Cannon*, 987 F.3d 924, 940 (11th Cir. 2021) ("Because each conspiracy requires 'proof of a fact which the other does not'—namely, a distinct type of agreement—the *Blockburger* test is satisfied, and the indictment is not multiplicitous.") (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). Churchwell therefore cannot show that his trial counsel performed deficiently by not moving to dismiss counts one and two on multiplicity and double jeopardy grounds. *See Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001) ("[C]ounsel [is] not ineffective for failing to raise a nonmeritorious issue.").

19

**Ground Two**

Switching from multiplicitous to duplicitous, Churchwell appears to allege that count ten of the superseding indictment was of the latter variety because it alleges two separate crimes, and that trial counsel was ineffective for not having objected to the error. *See* Civ. Doc. 4 at 5. Count ten alleged that Churchwell had knowingly used, carried, and discharged a firearm during and in relation to the drug-trafficking conspiracy (as described in count two) and maintenance of a drug premises (as described in count twenty), and during and in relation to murder in aid of racketeering (as described in count nine), and, in the course of the violation, caused the death of Earnestine Gardner by murder. Crim. Doc. 255 at 30–31. But this was not duplicitous.

A count is duplicitous if it charges two or more separate and distinct offenses. *See United States v. Schlei*, 122 F.3d 944, 977 (11th Cir. 1997). But it is not duplicitous if one count charges a defendant with violating a statute in multiple ways. *United States v. Burton*, 871 F.2d 1566, 1574 (11th Cir. 1989). Here, count ten charged Churchwell with violating 18 U.S.C. §§ 924(c)(1)(A)(iii) and 924(j)(1) in multiple ways, *i.e.*, by committing the predicate act of conspiring to traffic in a controlled substance, murder in aid of racketeering, or by maintaining a drug premises or aiding and abetting in maintaining a drug premises. This count was therefore not duplicitous.

Importantly, the prohibition against duplicity protects a defendant from a jury convicting him without unanimously agreeing on the same offense. *See Burton*, 871 F.2d at 1574. But there was no danger of that here; the jury verified that it unanimously found him guilty of using the firearm during both the conspiracy to

traffic in a controlled substance and maintaining a drug premises. *See* Doc. 406 at 3. Thus, it's clear that Churchwell was not subject to a non-unanimous verdict for count ten. He therefore cannot meet his burden under *Strickland* to establish that his counsel was ineffective for failing to move for dismissal of that count. *See Chandler*, 240 F.3d at 917.

### Ground Three

Ground three alleges that Churchwell's trial counsel was ineffective for "using the court to persuade Mr. Churchwell to forgo his ideal defense/and failure to secure expert testimony." Civ. Doc. 4 at 7. Churchwell claims he wanted to admit to the murder of Gardner and utilize an expert to testify that Churchwell "had nothing to do with anything else," and counsel not only declined, but had this Court persuade Churchwell to just "listen to [his] lawyer." *Id*.

Churchwell does not identify when or where counsel and this Court supposedly strong-armed him in such a manner, but the record shows that trial counsel requested and received a pre-trial *Faretta* hearing because Churchwell wanted to represent himself. *See* Crim. Doc. 238. The minutes of the hearing reflect that this Court advised Churchwell "regarding the consequences and responsibilities of self-representation" before ultimately denying the motion but also ordered Churchwell's requested transfer to another facility with daily access to the law library. *See id*; Crim. Doc. 246. If this is the discussion with the Court to which Churchwell alludes—he does not reference any date or proceeding—it is a far cry from the coercion he suggests counsel foisted upon him.

21

Nevertheless, the claim is facially insufficient. Churchwell does not explain what type of expert he wanted to call or how such expert would have established that "he had nothing to do with anything else." *See* Civ. Doc. 4 at 7. He offers no factual or legal support for his claim and merely concludes that counsel's alleged pressure on this Court "cost [him] his life." *See id*. But that's not enough. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (Vague, conclusory, unsupported, and insufficient allegations fail to sustain an ineffective assistance of counsel claim.).

As to the allegation that his counsel disagreed with Churchwell's desire to admit to the murder, that disagreement was well within the purview of counsel's professional judgment. *See Chandler v. United States*, 218 F.3d 1305, 1314, n.14 (11th Cir. 2000) ("[A] court must not second-guess counsel's strategy."). Admitting to the Gardner murder very well could have resulted in the jury automatically finding Churchwell guilty of each crime that was predicated in whole or in part on that murder: counts one, nine, and ten. But with Churchwell having *not* admitted to the murder, the jury ultimately found him not guilty of count nine—murder in the aid of racketeering—and further found that he did not commit that predicate offense for purposes of count ten. *See* Crim. Doc. 406. Having prevailed in that manner with counsel's chosen strategy, it is impossible for Churchwell to show that counsel performed deficiently by not choosing Churchwell's strategy, to wit, having Churchwell admit to the murder and then attempting to justify it using some unknown type of expert witness. And Churchwell cannot show that counsel's chosen decision to not pursue that strategy prejudiced him. He therefore cannot establish ineffective

assistance on this ground. *See Dorsey v. Chapman*, 262 F.3d 1181, 1186 (11th Cir. 2001) (holding that defendant failed to establish counsel's decision to not call expert witness was so patently unreasonable that no competent attorney would have chosen that strategy).

### Ground Four

Churchwell next asserts that appellate counsel was ineffective for failure to challenge on appeal an alleged violation of Churchwell's right to remain silent. *See* Civ. Doc. 4 at 8. Churchwell claims that he invoked his *Miranda*[7] rights during a post-arrest interview with Detective Darryl Davis, and that Davis testified at trial he knew Churchwell had invoked those rights but continued to question him anyway. *See id*. Churchwell filed a pretrial motion to suppress but it was not on this basis. *See* Crim. Doc. 179. Therefore, had this issue been raised on appeal, it would have been subject to the hyper stringent plain-error standard of review. *See Puckett v. United States*, 556 U.S. 129, 134–35 (2009). That standard of review would have required Churchwell to show: (1) an error; (2) that was plain; (3) that affected his substantial rights; and (4) that seriously affected the fairness, integrity, or public reputation of judicial proceedings. *See United States v. Massey*, 443 F.3d 814, 818 (11th Cir. 2006).

Churchwell would have failed at the start, as there was no error here. The transcript of the interview was entered into evidence as Government's Exhibit 3308 and reflects that Churchwell received his full *Miranda* rights but continued to talk to

---

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

23

the two investigators, and, notably, began asking *them* questions after being informed

he was being charged with murder:

DETECTIVE DAVIS: Having these rights in mind, do you wish to talk to us now?

CHURCHWELL: Talk about what? I talk to you.

DETECTIVE DAVIS: You'll talk?

DETECTIVE BLISS: Uh, I didn't tell him what his arrest was.

DETECTIVE DAVIS: Okay.

DETECTIVE BLISS: He's got warrants.

DETECTIVE DAVIS: Okay. Churchwell, you're in here under a murder warrant.

CHURCHWELL: How the hell I get under here in a murder warrant?

DETECTIVE BLISS: That's your phone.

DETECTIVE DAVIS: Jeez.

CHURCHWELL: What else I—

DETECTIVE DAVIS: Huh?

CHURCHWELL: What are y'all talk about?

DETECTIVE DAVIS: Okay. So you wanna—you wanna talk about it?

CHURCHWELL: Naw. I ain't—what Imma talk about a murder warrant for? I ain't—

DETECTIVE BLISS: Listen. You're being charged with a murder.

CHURCHWELL: I don't know nothin' about no murder.

DETECTIVE BLISS: Okay. We have multiple witnesses that put you at the residence where that woman was found shot. And they're pointing the finger at you.

We know you were there. So you might as well just go and give us your story, your—there's two sides to every story.

DETECTIVE DAVIS: It's always two.

CHURCHWELL: Um-um.

DETECTIVE BLISS: So you wanna give us your—we know you were there. This is your chance to give us your side of the story.

CHURCHWELL: I'm tryin' to figure out what y'all are talkin' about.

DETECTIVE DAVIS: That's what it is.

CHURCHWELL: Who was shot? Who the hell was shot?

DETECTIVE JEFF BLISS: You shot a young woman.

Government's Exhibit 3308 at 4–6

Churchwell goes on to explain his whereabouts during the relevant timeframe with no request to speak to an attorney or any other act suggesting he wanted to remain silent and end the interview. *See* Government's Exhibit 3308 at 6–72. And he never confessed to the murder during the interview. *See id.*

Churchwell inaccurately represents the content of the transcript that was entered into evidence, which states his response to Detective Davis as, "Naw. I ain't—what Imma talk about a murder warrant for? I ain't—." *See* Government's Exhibit 3308 at 5. This is distinct from Churchwell's representation that he responded more concretely with, "No, I don't." *See* Civ. Doc. 4 at 8. The latter may be based on another transcription of the interview about which Detective Davis was questioned by Churchwell's attorney during cross-examination, but which was never entered into evidence. *See* Crim. Doc. 537 at 113–114. In any event, Detective Davis explained that

25

he did not interpret Churchwell's response as an invocation of his Fifth Amendment rights because Churchwell continued talking to them despite the "Naw." *See id*. at 114.

A suspect invoking his right to remain silent must do so unambiguously; "an ambiguous or equivocal act, omission, or statement" will not suffice. *Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010). "An unequivocal and unambiguous invocation of the right to remain silent is one articulated 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request' to exercise his right to remain silent and terminate the interrogation, not that it might be a request to remain silent." (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)). Churchwell's response to Detective Davis was not an unequivocal expression invoking his right to remain silent. Although he said, "Naw," he continued talking and even asked his own questions. This was insufficient to invoke his right to silence. *See Berghuis*, 560 U.S. 370, 382 ("[The defendant] did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his right to cut off questioning. Here he did neither, so he did not invoke his right to remain silent." (quotation marks and citation omitted)).

Accordingly, Churchwell would have been unable to clear even the first hurdle of plain-error review: establishing error. That in itself prevents relief on this ground, as claims of ineffective assistance of appellate counsel are governed by the same standards applied to trial counsel under *Strickland*, requiring him to show both deficient performance and prejudice. *See Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir.

1991). "[T]he Sixth Amendment does not require appellate advocates to raise every non-frivolous issue." *Id.* at 1130–31. Raising weaker issues on appeal risks diluting the force of stronger arguments, diverting the court's attention, and undermining counsel's credibility. *See Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989); *see, e.g., McBride v. Sharpe*, 25 F.3d 962, 973 (11th Cir. 1994). For that reason, effective appellate attorneys "will weed out weaker arguments, even though they may have merit." *Philmore v. McNeil*, 575 F.3d 1251, 1264 (11th Cir. 2009); *see also Overstreet v. Warden*, 811 F.3d 1283, 1287 (11th Cir. 2016). And a finding of prejudice under *Strickland* requires that "the neglected claim would have a reasonable probability of success on appeal." *Philmore*, 575 F.3d at 1265. Churchwell fails in this endeavor, as he cannot even show that he invoked his right to remain silent, much less that his appellate counsel should have raised the issue on direct appeal and would have been successful in doing so. Churchwell doesn't even challenge specific statements from the interview or explain how any of its content prejudiced him at trial. *See* Civ. Doc. 4 at 8. He never confessed during the interview and the interview itself was a seemingly minor part of the United States' evidence on which it did not even rely during its closing argument. *See* Crim. Docs. 537 at 101–107; 542 at 12–62, 130–41.

Churchwell having failed to establish either deficiency or prejudice, this ground must be denied. *See Brown v. United States*, 720 F.3d 1316, 1335 (11th Cir. 2013) ("[T]here can be no showing of ... prejudice from an appellate attorney's failure to raise a meritless claim.").

**Ground Five**

In his fifth ground, Churchwell claims that trial counsel was ineffective for failing to challenge the United States' alleged violation of Churchwell's right to due process. *See* Civ. Doc. 4 at 13–16. It is, admittedly, difficult to discern the parameters of this ground, but the crux of it appears to be that the United States acted in bad faith in filing charges against Churchwell, and that counsel should have challenged it both before and after trial. *See* Civ. Doc. 4 at 13–16. Churchwell cannot make this showing, however.

Churchwell seemingly alleges that the United States was only able to charge and convict him in this case via means of government misconduct: illegally putting him a cell with a jail informant, presenting false evidence, and finagling a nolle-prosequi of his state case. *See id*. He further references the loss of his speedy trial rights due to the United States' intentional delay in bringing charges in this case, and he repeatedly alleges a "tactical advantage" the United States received through its misconduct. *See id*. But it's not at all clear what Churchwell means by that. The criminal justice system is an adversarial one, with differing goals on each side. The United States seeks to charge and convict individuals for applicable crimes, but its actions do not per se qualify as misconduct when it successfully does so, despite what Churchwell thinks. And nothing that Churchwell has alleged is supported by the record or caselaw. He has offered no authority for the proposition that the United States was not permitted to use informants in gathering information. He has offered no evidence that the United States admitted false evidence at grand jury or trial, and he

offers neither to establish that the United States' indictment in this case deprived him of any rights in any other criminal case in any jurisdiction.

Churchwell's claims are not merely fanciful, they are entirely speculative, unsupported, and conclusory. He has alleged no credible act of government misconduct to which his trial counsel should have lodged objections. And he therefore wholly fails to meet his burden of showing ineffective assistance of counsel under *Strickland*. *See Morris v. United States*, No. 2:13CV240-MHT, 2015 WL 5735649, at *4 (M.D. Ala. Sept. 30, 2015) (unpublished) (characterizing defendant's unsubstantiated claims of government misconduct from indictment through prosecution as "rank speculation").

### **Ground Six**

Ground six appears to be a claim that trial counsel was ineffective for failing to have Churchwell evaluated for competency before and during trial and before sentencing. *See* Civ. Doc. 4 at 16. To be competent to stand trial, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Lawrence v. Sec'y, Fla. Dep't of Corr.*, 700 F.3d 464, 480–81 (11th Cir. 2012) (quotation marks omitted). A defendant is not entitled to a presumption of incompetency and must demonstrate his incompetency by a preponderance of the evidence. *Id.* at 481. "[T]he standard of proof is high," and the facts must "positively, unequivocally and clearly generate the legitimate doubt." *Card v. Singletary*, 981 F.2d 481, 484 (11th Cir. 1992) (quotation marks omitted).

To show deficient performance in this context, a defendant must show that counsel failed to bring information raising a bona fide doubt regarding the defendant's competency to the court's attention when every reasonable attorney would have done so. *See Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 751 (11th Cir. 2010). To establish prejudice, he must further show that "there was a reasonable probability that he would have received a competency hearing and been found incompetent had counsel requested the hearing." *Lawrence*, 700 F.3d at 479. But Churchwell can show neither.

Although Churchwell presents myriad allegations of his mental health issues, *see* Civ. Doc. 4 at 16, none of those are reflected in the record. To the contrary, the PSR reflects Churchwell's self-report that his mental health history was limited to a diagnosis of depression while serving a state sentence. *See* Crim. Doc. 442 ¶ 154. And his mother reported that Churchwell had never had mental health issues or spent any significant time in the hospital. *Id.* ¶¶ 151, 153. This is quite distinct from Churchwell's § 2255 claims that he has been diagnosed with schizophrenia, bipolar disorder, severe anxiety, manic depression, and post-traumatic stress disorder, and has "been critically hospitalized several times for psychological trauma." *See* Civ. Doc. 4 at 16.

There is trial evidence to contradict his claim, too. Among other things, the jail calls entered into evidence establish that Churchwell was engaging with his attorney and codefendants, staying abreast of the evidence in the case, and actively strategizing his defense. *See*, *e.g.*, Government's Exhibits 3351, 3353. Churchwell's other grounds in this § 2255 proceeding belie this one as well. Those include his allegations that he "put his trial counsel on notice and advised him to object," *see* Civ. Doc. 4 at 19, and

30

pushed for an alternative defense strategy of admitting to the Gardner murder and securing an expert witness, *see id*. at 7. That shows Churchwell's ability to consult with counsel even more than the "reasonable degree of understanding" and rational and factual understanding of the proceedings that the Constitution requires. *See Lawrence*, 700 F.3d 464 at 480-81.

Churchwell has wholly failed to meet his burden under *Strickland*. There is simply nothing in the record to suggest that Churchwell was operating with a limited mental capacity before, during, or after his trial or sentencing and thus, nothing to establish that his counsel was constitutionally ineffective for failing to request a competency evaluation. This ground must therefore be denied.

### **Ground Seven**

Churchwell next alleges ineffective assistance of trial counsel for failure to object to this Court's response to the jury's first question during deliberations. Civ. Doc. 4 at 17. Again, he cannot meet his required burden.

The jury inquired whether a defendant could be "charged guilty of murder if they are not found guilty or racketeering," and "vice versa." Crim. Doc. 542 at 144. Interpreting the jury's question as addressing only the actual "murder" charges in the indictment, the court responded to the question in writing, saying:

Please consider the instructions as a whole and do not single out one part alone. The answer to your question is as follows:

A. As to the Murder in Aid of Racketeering counts (counts 4, 9, 14 and 16), the Government must prove beyond a reasonable doubt that the defendant under consideration for the purpose of maintaining and increasing position in the Enterprise, an Enterprise engaged in racketeering activity, unlawfully and knowingly murdered

31

the victim under consideration. So on those four counts, the existence of the enterprise and the defendant's participation in it must be proven beyond a reasonable doubt.

Crim. Doc. 394-1.

Churchwell has not shown that this instruction was inaccurate or otherwise misleading. The only basis for his claim is that he "feels[s]" the question may have been directed at count one. *See id*. But this Court carefully tailored its response to the jury's question to address only "the Murder in Aid of Racketeering counts (counts 4, 9, 14 and 16)," *see* Crim. Doc. 394-1, which were the only counts that actually charged "murder" as the potential crime of conviction. Therefore, the instruction that this Court gave constituted a correct statement of the law and Churchwell's counsel cannot have performed deficiently by not objecting to it. *See Taylor v. United States*, 210 F. App'x 947, *1–2 (11th Cir. 2006) (counsel was not ineffective for not raising meritless objections).

### **Ground Eight**

Churchwell next contends that counsel was ineffective for failing to move to suppress or to object to the admission of Government's Exhibit 3007, home security video footage depicting Churchwell at the scene of Gardner's murder, because Detective Main "voluntary[i]ly destroyed" several hours of the footage. *See* Civ. Doc. 4 at 18. This claim is entirely without merit.

To begin with, Churchwell inaccurately attributes admission of the video to Detective Benjamin Main, *see* Civ. Doc. 4 at 18, but it was Detective Daniel Dickerman through which the United States admitted the footage. *See* Crim. Doc. 537

at 193–201. According to his testimony, the footage was taken from a home security system, and he selected clips on-scene to download, then view later at the office on larger screens. *Id.* at 193–94. The owner of the security system, Esteban Mares, confirmed that law enforcement took the portions of video they wanted at the time. *See* Crim. Doc. 538 at 37.

The testimony regarding the content of the video was extensive. Detective Dickerman testified as to dates, times, angles, geographic coverage, and more. *See* Crim. Docs. 537 at 193–201; 538 at 20–21. And he was clear that he did not download the entirety of the available footage due to storage limitations, but instead, selected for download only usable portions, *e.g.*, people coming into the scene. *See* Crim. Doc. 537 at 193–201.

Churchwell conflates Dickerman's on-scene decision to download only certain portions of the available footage with voluntary destruction of and tampering with the evidence, and the distinction between them is significant. There is absolutely nothing to support Churchwell's accusation and the evidence at trial belies it. There was no subterfuge for Churchwell's counsel to object to or form the basis for a motion to suppress. Accordingly, Churchwell fails to establish that counsel acted deficiently in this regard.

Moreover, counsel *did* challenge this evidence at trial, specifically questioning Detective Dickerman about his decision to "pick and choose" which portions of the footage to download. *See* Crim. Doc. 537 at 195–96. So, even though the evidence was fully admissible, counsel still emphasized to the jury through this questioning that it

33

was seeing only the footage Detective Dickerman had unilaterally "felt was relevant[.]" *See id.* at 196. This circumstance prevents Churchwell from clearing the prejudice hurdle under *Strickland*, too.

### Ground Nine

Churchwell claims that counsel was ineffective for failing to object to the authenticity of four exhibits, Government's 3350–3353, which, Churchwell alleges, were jail calls made by someone other than him. *See* Civ. Doc. 4 at 18–19. These exhibits—audio recordings and transcripts—were admitted during the testimony of Detective Jonathan Kruse. *See* Crim. Doc. 538 at 145–48.[8] Detective Kruse explained that the conversations were between Rodriguez and Churchwell and that he recognized Rodriguez's voice on the calls. *Id.* at 150. As to Churchwell, Kruse explained that the calls were made with Churchwell's assigned pin number and that Churchwell had identified himself as the caller using his nickname "Boo Boo." *Id.* at 150–51. But Churchwell claims that voice wasn't his; he alleges that the calls were instead made by three other individuals: Michael Peluyera, Ernest Williams, and Roosevelt Johnson, and that the United States tampered with the evidence to make it appear that it was Churchwell on the calls. *See* Civ. Doc. 4 at 19. He offers nothing to support that allegation, however. Certainly, he doesn't explain how, despite his name being deleted from the operating system, *id.*, his voice could be replicated for the audio

---

[8] Trial counsel objected to admission of the recordings, but not on authenticity grounds. Crim. Doc. 538 at 147.

recordings that were published to the jury. And he doesn't explain how the content of the calls makes sense if it were anyone *but* Churchwell speaking with Rodriguez. This is particularly so given Churchwell's refrain on the November 18, 2016, call that he "wasn't there" and his statement that he cannot get a job, both of which repeat statements he made in his post-arrest interview. *See* Government's Exhibit 3351. Rodriguez also referenced Churchwell's prior murder charge to him as a reason law enforcement was targeting Churchwell in this case. *Id*. at 15. And Churchwell talks about his little brother, Zae, and gives Rodriguez Zae's phone number. *Id*. at 16–17.

One "must do more than make conclusional assertions." *Woodard v. Beto*, 447 F.2d 103, 104 (5th Cir. 1971) (citing *Packnett v. United States*, 435 F.2d 693 (5th Cir. 1970)). Churchwell has failed to establish that the transcripts and audio recordings were tampered with to make it erroneously appear that it was him on the calls with Rodriguez. Thus, he cannot show either deficient performance or prejudice from counsel having not objected to the exhibits on that basis.

### Ground Ten

In ground ten, Churchwell alleges that his trial counsel was ineffective for failing to move for a mistrial in light of numerous errors. *See* Civ. Doc. 4 at 19. To establish ineffective assistance in this context, Churchwell would have to show an error meriting a mistrial and a reasonable probability of a different result if counsel had moved for a mistrial. *Brewster v. Hetzel*, 913 F.3d 1042, 1052 (11th Cir. 2019). Churchwell cannot make this showing as he has identified no errors whatsoever.

Churchwell has already challenged some of these alleged errors in his § 2255 motion through ineffective assistance of counsel claims, including the admission of allegedly tampered evidence (footage from Mares's home security system, Government's Exhibit 3007, and recordings and transcripts from Churchwell's jail calls, Government's Exhibits 3350–53) and this Court's response to a jury question. Here, Churchwell is merely repackaging those claims—grounds seven, eight, and nine—and they must again fail because Churchwell has not met his burden under *Strickland* to establish ineffective assistance.

Notwithstanding that, Churchwell adds to ground ten a claim that counsel should have moved for a mistrial in part because Agent Melinda Sears was permitted to testify for the United States even though she sat through the entire trial. *See* Civ. Doc. 4 at 19–20. But Churchwell's counsel had no basis to object to this, as Fed. R. Evid. 615(b) allows "an officer or employee of a party [who has been] designated as the party's representative" to be present during trial, and the Advisory Committee Notes further instruct that the government is permitted "to have an investigative agent at counsel table throughout the trial" even if "the agent is or may be a witness." Agent Sears was the case agent for the United States and, as such, was permitted to be present throughout the trial and also testify on behalf of the United States. Thus, Churchwell cannot show that counsel not having moved for mistrial on this basis was deficient performance under *Strickland*.

Churchwell further adds as an alleged ground for mistrial Stephanie Brewer's "false testimony" and her "refusal to respond to defense counsel[.]" Churchwell,

however, doesn't identify any particular testimony that was supposedly false or any specific question that Brewer refused to answer. *See* Civ. Doc. 4 at 20. But the trial transcript reflects that Brewer never refused to answer a question by any of the defense attorneys that cross examined her, including Churchwell's counsel, despite that she pushed back on credibility attacks and at times questioned the relevance of the inquiry. *See* Crim. Doc. 537 at 38–68. Moreover, her testimony gave all the appearance of candor; she readily acknowledged her extensive history of drug use, prostitution, and violence, including her job collecting drug debts that involved "whip[ping] girls' asses." *See id.* And she remained steadfast in her testimony that Churchwell shot Gardner right in front of her.

Brewer's testimony had no indication of untruthfulness, though it was indeed damaging to Churchwell, as the testimony of any eyewitness to murder would be. That, however, was not a basis for counsel to object to it, much less to move for mistrial. Here, counsel did the only thing he *could* do to combat an eyewitness to Churchwell's murder of Gardner: cross-examine her extensively and attempt to undermine her credibility. *See* Crim. Doc. 537 at 47–68. Churchwell cannot show this was deficient performance, and he therefore fails to establish ineffective assistance for failing to move for mistrial.

**<u>Ground Eleven</u>**

Here, Churchwell alleges that trial counsel was ineffective for failing to file a Fed. R. Crim. P. 29 motion for judgment of acquittal as to count eleven. Civ. Doc. 4 at 20. Count eleven charged Churchwell with possessing ammunition after having been

convicted of a felony. Crim. Doc. 255 at 31. Churchwell, however, challenges the

evidence to show he possessed a *firearm*, a crime with which he was never charged.

And the United States explained why to the jury:

> Count 11, we are charging him with illegally possessing the ammunition
> he used to kill Earnestine Gardner. He had no lawful reason to be able to
> possess it. Why didn't we charge the gun? We don't have the gun. We cannot
> tell you if that gun was made outside of the State of Florida. But what Walton
> Lanier told you is that in Florida we are in a unique position with respect to
> ammunition. Modern ammunition requires primer, and primer is not made in
> Florida.
>
> Now, you saw the video. You saw the gunshots to her back. She wasn't
> shot with a musket. She wasn't shot with a bow and arrow. She was shot with
> modern ammunition. Okay? So the ammunition affected interstate commerce.

Crim. Doc. 542 at 46.

Churchwell is correct that there was no testimony about the model of firearm

used to kill Gardner or that it violated interstate commerce, *see* Civ. Doc. 4 at 20, but

that's because the United States never charged him with firearm possession and

therefore did not require the proof that Churchwell mistakenly thinks it did. Thus,

Churchwell is wholly unable to establish that counsel was deficient on this basis.

### **Ground Twelve**

In his final ground, Churchwell claims that counsel was ineffective for failing to

object to the life sentence imposed on count one, which Churchwell contends had a

maximum sentence of only 20 years' imprisonment. *See* Civ. Doc. 4 at 20–21. He

doesn't explain why he thinks this is so, but, in any event, he's wrong. The statutory

maximum penalty for a violation of 18 U.S.C. § 1962(d) is life imprisonment if the

violation is based on a racketeering activity for which the maximum penalty includes

life imprisonment. *See* 18 U.S.C. § 1963(a). Here, the racketeering violation was based on Florida first-degree murder, *see* Crim. Docs. 255 at 23; 406 at 1, which is punishable by life imprisonment, *see* Fla. Stat. § 782.04 (designating first-degree murder as a capital felony); Fla. Stat. § 775.082(1)(a) (mandating punishment of life imprisonment in the event a death sentence is not imposed). Thus, counsel could not have lodged an objection to the life sentence as Churchwell claims he should have. *See Taylor*, 210 F. App'x at *1–2) (counsel was not ineffective for not raising meritless objections). Churchwell therefore fails to establish any deficiency by counsel in this regard.

### E.   Need for an evidentiary hearing

Churchwell is not entitled to an evidentiary hearing. To establish entitlement to an evidentiary hearing on a claim of ineffective assistance of counsel, a petitioner must "allege facts that would prove both that his counsel performed deficiently and that he was prejudiced by his counsel's deficient performance." *Hernandez v. United States*, 778 F.3d 1230, 1232–33 (11th Cir. 2015). Churchwell has the burden of establishing the need for an evidentiary hearing, *see Birt v. Montgomery*, 725 F.2d 587, 591 (11th Cir. 1984) (en banc), and he would be entitled to a hearing only if his allegations, if proved, would establish a right to collateral relief, *see Townsend v. Sain*, 372 U.S. 293, 307 (1963).

This Court may consider the entire record when determining whether to hold an evidentiary hearing. *See Winthrop-Redin v. United States*, 767 F.3d 1210, 1216 (11th Cir. 2014). Summary dismissal is warranted when "it plainly appears from the face of

the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief[.]" *Broadwater v. United States*, 292 F.3d 1302, 1303 (11th Cir. 2003) (quoting 28 U.S.C. foll. § 2255). Accordingly, no hearing is required when the record establishes that a § 2255 claim lacks merit, *see United States v. Lagrone*, 727 F.2d 1037, 1038 (11th Cir. 1984), or when the petitioner's allegations are patently frivolous, based upon unsupported generalizations, or affirmatively contradicted by the record, *see Aron v. United States*, 291 F.3d 708, 714–15 (11th Cir. 2002) (citation omitted).

Churchwell has not established the need for an evidentiary hearing because each of the twelve grounds he raises is facially sufficient and/or lacks merit. This Court therefore should not order an evidentiary hearing to resolve any of Churchwell's claims.

THEREFORE, the United States respectfully requests that this Court deny Churchwell's 28 U.S.C. § 2255 motion.

<div style="margin-left:40%">

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

By:   *s/ Dawn A. Tiffin*
DAWN A. TIFFIN
Assistant United States Attorney
Appellate Division
Florida Bar No. 28788
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000
Dawn.Tiffin@usdoj.gov

</div>

**Churchwell v. United States**          **Case No. 8:25-cv-373-WFJ-TGW**

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2025, a true and correct copy of the

foregoing document and the notice of electronic filing were sent by United States

Mail to the following non-CM/ECF participant:

Alfonzo Lee Churchwell
Reg. No. 69511-018
USP Florence ADMAX
U.S. Penitentiary
Po Box 8500
Florence, CO  81226


                              */s/ Dawn A. Tiffin*
                              DAWN A. TIFFIN
                              Assistant United States Attorney